**CLAYEO C. ARNOLD, A PROFESSIONAL CORPORATION**
M. Anderson Berry (SBN: 262879)
Gregory Haroutunian (SBN: 330263)
865 Howe Avenue
Sacramento, CA 95825
Telephone: (916) 239.4778
Fax: 916.924.1829
Email: *aberry@justice4you.com*
Email: *gharoutunian@justice4you.com*

*Additional Counsel Listed Below*

### UNITED STATES DISTRICT COURT

### NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHAMANDEEP KAUR, Derivatively on Behalf of VISA, INC. | Case No: 3:25-cv-02849 |
| Plaintiff, | |
| v. | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| RYAN MCINERNEY, CHRIS SUH, PETER ANDRESKI, LLOYD A. CARNEY, MARY B. CRANSTON, KERMIT R. CRAWFORD, FRANCISCO JAVIER FERNANDEZ-CARBAJAL, RAMON LAGUARTA, TERI L. LIST, JOHN F. LUNDGREN, ROBERT W. MATSCHULLAT, DENISE M. MORRISON, PAMELA MURPHY, LINDA J. RENDLE, MAYNARD G. WEBB JR., ALFRED F. KELLY, JR., and VASANT PRABHU | **JURY TRIAL DEMANDED** |
| Defendants, | |
| and, | |
| VISA, INC., | |
| Nominal Defendant. | |

Plaintiff Chamandeep Kaur ("Plaintiff"), by and through her undersigned counsel, derivatively on behalf of Visa, Inc. ("Visa" or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon her personal knowledge as to herself and her own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by the Company with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought in the right, and for the benefit, of the Company against certain of its officers and directors seeking to remedy the Individual Defendants' violations of law that has occurred from November 16, 2023, through the present (the "Relevant Period") and has caused substantial harm to the Company.

2.      Visa is a payment processing company that, among other things, facilitates the transfer of money between consumers and merchants. In addition to credit cards, Visa processes payments made using debit cards. More than 60% of consumer debit transactions in the United States were processed on Visa's debit network. The Company has agreements with merchants and issuers that ensure that Visa's debit network is the exclusive or primary debit network used for consumer debit transactions. The Company offers financial incentives to its clients to promote the use of Visa's debit network. The Company has discussed these agreements and incentives in financial reports filed with the SEC and in conference calls with analysts and investors.

3.      Through the Relevant Period, the Individual Defendants issued false and misleading statements and/or failed to disclose that: (i) the Company was participating in the Anticompetitive Misconduct in violation of federal antitrust laws; (ii) as such, the Company was likely to be subject to lawsuits and penalties by federal agencies; and (iii) at all relevant times, the Company failed to have effective internal controls. As a result of the foregoing, the Company's statements about its

business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

4.    The truth was ultimately revealed in September 2024 when it was reported that the Department of Justice ("DOJ") was preparing to file a lawsuit against the Company for purported antitrust violations. The following day, on September 24, 2024, the DOJ filed a complaint in the Southern District of New York alleging four violations of the Sherman Act. On this news, the price of the Company's stock fell $15.85 per share, or approximately 5.5%, from a close of $288.63 per share on September 23, 2024, to close at $272.78 per share on September 24, 2024.

5.    As a result of the Individual Defendants' misconduct, Visa is now subject to a securities fraud class action, an antitrust class action, and the DOJ action, among other things, which are causing substantial harm to Visa. Meanwhile, three of the Individual Defendants breached their fiduciary duties by engaging in lucrative insider trading while the Company's stock was artificially inflated as a result of the Individual Defendants' false and misleading statements discussed herein, reaping personal profits of approximately $12.6 million.

6.    Further, through the Relevant Period, the Individual Defendants caused the Company to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations. Indeed, between February 2024 and September 2024, approximately 30,000,000 shares of Visa stock were repurchased, costing the Company approximately $8.4 billion. As the Company's stock was actually worth only $272.78 per share, the price at which it was trading when markets closed on September 24, 2024, the Company overpaid for repurchases of its own stock by approximately $214.4 million.

7.    In sum, the Individual Defendants have caused serious and significant harm to the Company and the Plaintiff seeks to bring this derivative lawsuit for the benefit of the Company.

## JURISDICTION

8.    This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 as Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, and Sections 10(b) and 20(a)

of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

9.     This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

10.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because: (i) the Company maintains its principal place of business in this District; (ii) one or more of defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the Individual Defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to the Company, occurred in this District; and (iv) Individual Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

### Plaintiff

11.     *Plaintiff Chamandeep Kaur* ("Plaintiff") is, and was, a shareholder of the Company since April 30, 2020.  Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

### Nominal Defendant

12.     *Nominal Defendant Visa* is a Delaware corporation with its headquarters at P.O. Box 8999, San Francisco, California 94128. Visa's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "V."

**Director Defendants**

13.    ***Defendant Ryan McInerney*** ("McInerney") y has served as the CEO and a director of Visa since February 2023. Previously, he served as the President of the Company from May 2013 through January 2023.

14.    ***Defendant Lloyd A. Carney*** ("Carney") has been a director of the Company since 2015. Defendant Carney served on the Audit and Risk Committee during the relevant time period.

15.    ***Defendant Mary B. Cranston*** ("Cranston") served as a director of the Company from 2007 until January 24, 2023.

16.    ***Defendant Kermit R. Crawford*** ("Crawford") has been a director of the Company since 2022. Defendant Crawford served on the Audit and Risk Committee during the relevant time period.

17.    ***Defendant Francisco Javier Fernandez-Carbajal*** ("Fernandez-Carbajal") has been a director of the Company since 2007.

18.    ***Defendant Ramon Laguarta*** ("Laguarta") has been a director of the Company since 2019. Defendant Laguarta served on the Audit and Risk Committee during the relevant time period.

19.    ***Defendant Teri L. List*** ("List") has been a director of the Company since 2022. Defendant List served on the Audit and Risk Committee during the relevant time period.

20.    ***Defendant John F. Lundgren*** ("Lundgren") has been a director of the Company since 2017.

21.    ***Defendant Robert W. Matschullat*** ("Matschullat") served as a director of the Company from 2007 until January 24, 2023.

22.    ***Defendant Denise M. Morrison*** ("Morrison") has been a director of the Company since 2018. Defendant Morrison served on the Audit and Risk Committee during the relevant time period.

23.    ***Defendant Pamela Murphy*** ("Murphy") has been a director of the Company since April 2023.

24.     ***Defendant Linda J. Rendle*** ("Rendle") has been a director of the Company since 2020.

25.     ***Defendant Maynard G. Webb, Jr.*** ("Webb") has been a director of the Company since 2014.

26.     The above-named defendants are collectively referred to herein as the "Director Defendants."

**Officer Defendants**

27.     ***Defendant Alfred F. Kelly, Jr.*** ("Kelly") served as CEO and President of the Company from 2014 to February 1, 2023. Defendant Kelly served as a director of the Company from 2014 to January 23, 2024, and as Executive Chairman from February 1, 2023, to January 23, 2024.

28.     ***Defendant Peter Andreski*** ("Andreski") has served as the Company's CAO and SVP – Global Corporate Controller since July 2022. Previously, he served as the SVP – Head of Global Revenue Operations.

29.     ***Defendant Chris Suh*** ("Suh") has served as Chief Financial Officer ("CFO") of the Company since August 1, 2023.

30.     ***Defendant Vasant Prabhu*** ("Prabhu") served as CFO of the Company from 2015 to August 1, 2023.

31.     Defendants Kelly, Andreski, Suh, and Prabhu along with Defendant McInerney are collectively referred to herein as the "Officer Defendants."

32.     The Director Defendants along with the Officer Defendants are collectively referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

**Background**

33.     Since 1958, Visa has facilitated payments between consumers and businesses. Now, Visa facilitates those payments on a global scale, moving money across over 200 countries and territories among consumers, merchants, financial institutions, and governmental entities. During its

fiscal year 2024, which ended on September 30, 2024, 303 billion payment and cash transactions were made with a Visa product, of which Visa processed more than 233.7 billion transactions, or over 77%. Visa earns revenue when Visa products are used in a transaction, and when the transactions are processed using Visa's network. In fiscal year 2024, Visa earned $35.9 billion in revenue.

34.     In 2023 alone, Visa processed $15 million in monetary transactions across the globe. Visa also holds a distinct majority on the industry, with over 60% of all debit transactions within the United States being processed by Visa, with Mastercard being a distant second.[1] As a result of this market dominance, the Company takes home massive profits, with over $7 billion being attributed to network fees annually in just debit volume within the United States, $5.6 billion of which is net revenue. In total within North America, Visa holds an 83% profit margin.

35.     Visa's dominant market share is the product of intentional and calculated anticompetitive steps to limit competition and maintain its monopoly power. This dominance, however, has also caused governments worldwide to consistently monitor the Company for any supposed antitrust violations. For example, in 2020, the DOJ sued Visa to prevent the Company from acquiring digital payment provider Plaid, due to alleged antitrust concerns.

**Debit Transactions**

36.     Debit transactions are financial transactions in which funds are drawn directly from a consumer's bank account to pay for goods or services. These transactions are utilized in various ways, from buying goods at a retailer to paying bills online.

37.     As such, millions of Americans utilize debit transactions when making purchases, despite not receiving rewards as one would with a credit card. This can be attributed to a number of reasons, including being unable to obtain a credit card, having insufficient credit available, avoiding

---

[1] Mastercard, processes less than 25% of all debit transactions in the United States. The remaining debit network providers, primarily PIN networks, make up only a fraction of the remaining debit network transactions.

the lending dynamics of a credit card, preferences for using only the funds available in one's account, and the convenience of debit as opposed to that of cash or checks.

38.    General purpose debit cards, *i.e.*, debit cards that merchants will generally accept, are the most used debit cards in the United States. Visa and other debit networks do not issue debit cards. Rather, consumers' bank, the "issuing bank" or "issuer" provides the consumer with a debit card. Visa enters into agreements with issuing banks to create and issue debit cards that run on its network. Relatedly, merchants' banks, the "acquiring bank" or "acquirer", enter into agreements with Visa so that merchants can and will accept consumers' debit payments.

39.    The transfer of funds from the issuing bank to the acquiring bank occurs over the debit network. The debit network assigns a debit credential or other unique identifier to consumers that can be accepted by all merchants who participate on the same network. The debit network also provides payment guarantees for merchants, a method to dispute and chargeback transactions for consumers, fraud protection for all parties, and a way for issuing banks and acquiring banks to communicate with one another (*i.e.*, the "rail").

40.    Banks, not debit networks, transfer money from the consumer's account to the merchant's account. Debit networks, like Visa's, provide the mechanism to achieve these transactions. Debit networks also establish rules for transactions occurring on the network. Visa, however, influences the rules for other debit networks by leveraging its market power and necessary role in completing the majority of debit transactions.

41.    Consumers use their debit cards to make purchases in person or online. Debit card credentials link the consumer's account to the debit card and act as a security feature. Debit card credentials include, for example, a 16-digit card number ("debit card number"), card verification value ("CVV"), expiration date, pin number, and EMV security chip. The card will also graphically identify the "front-of-card" network. Some debit cards also identify the "back-of-card" network. As a result of the Durbin Amendment, debit cards can have numerous networks enabled but must have at least one unaffiliated back-of-card network. Generally, however, most cards are limited to a single

front-of-card network and one or two back-of-card networks, one of which is unaffiliated with the front-of-card network. The image below shows the debit card credentials and networks:



42.     A debit transaction in its simplest form involves six steps: (1) a consumer buys goods or services from a merchant and presents a debit card for payment; (2) a merchant captures the consumer's account information via debit credentials and sends it to the acquiring bank; (3) the acquiring bank asks the debit network for an authorization from the issuing bank; (4) the debit network submits the transaction to the issuing bank for authorization; (5) the issuing bank authorizes the transaction and sends the response to the merchant; and (6) the issuing bank transfers the money, minus a fee ("interchange fee") from the consumer's bank account to the acquiring bank to be deposited into the merchant's bank account. Debit transactions are processed in a matter of seconds. The images below provide a graphical representation of the transaction:

///

///

///





43.     Card-not-present transactions require debit credentials, entered manually by the consumer or that have been saved in a digital wallet, such as Google Pay, Apple Pay, or PayPal. Card-not-present transactions rarely, if ever, require a PIN number, and instead rely on other security features, such as multi-factor authentication.

**Entry to the Debit Network Market**

44.     There are very high barriers to entry into the debit network market. An issuing bank will only place a network on its debit cards if many acquiring banks and merchants accept the network. Meanwhile, merchants and acquiring banks will only join a debit network if many issuing

banks select the debit network on their debit cards. Simply put, an aspiring debit network provider faces a classic chicken-and-egg problem, where success is contingent on gaining massive scale on both sides of the transaction, a feat that is exceptionally difficult. This barrier to entry protects debit network providers like Visa, by far the largest, from competition, and its anticompetitive conduct thwarts efforts by would-be competitors to surmount these barriers.

45.     In creating debit accounts, the Company does not issue debit cards to accountholders directly. Instead, Visa contracts with banks, who then issue the debit cards to the banks' respective accountholders. The banks also move the money between consumers and merchants. Where Visa comes in its by clearing and overseeing the interbank settlement process, aggregating all transactions daily for each bank, netting out any applicable fees, and providing settlement reports to all banks within its network.

46.     Within the United States, debit cards must have at least two debit networks, a "front-of-card" network, and a "back-of-card" network. The illusion of choice in the network a consumer uses is merely illusory, as the networks are selected by the bank. While banks have the option to switch front-of-card networks, this is rarely done due to, inter alia, the costs imposed to switch networks (such as issuing new debit cards to all accountholders). Issuers also get to choose whether to enable a front-of-card network or a back-of-card network to process a transaction.

47.     Visa is the predominant front-of-card network, with Mastercard comprising a distant second. Back-of-card networks must include at least one network that is wholly independent from the respective front-of-card network. As such, a debit card that has Visa as its front-of-card network usually will have Interlink, Visa's back-of-card network, as well as an independent back-of-card network.

48.     Debit networks such as the Company earn revenue through imposing network fees on issuers and acquirers for every debit transaction. There are two kinds of fees a network may charge: per-transaction fees and fixed fees. A per-transaction fee exists in that a merchant's acquirer will pay Visa a network fee for every transaction conducted on the Company's network. The amount of a network fee varies from transaction to transaction based on several factors. Separately, Visa

also began to charge merchant's acquirers fixed, monthly fees that are based on the number of locations operated by the merchant, and the volume of the merchant's card-not-present transactions.

49.     Acquirers also pay per-transaction fees to the issuer, known as an interchange fee, to pay the issuer for services rendered.

**Debit Network Fees**

50.     Consumers do not pay debit networks like Visa directly to use their services. Rather, debit networks charge fees to both issuing banks and acquiring banks for every debit transaction.

51.     Acquiring banks pay two types of fees: per-transaction fees and fixed fees. The acquiring bank pays Visa a "network fee" on every transaction processed through Visa's network. Network fees vary depending on the type of transaction, including whether the consumer pays in-person or online. Since 2012, Visa also charges acquiring banks a fixed monthly fee, or "Fixed Acquirer Network Fee" ("FANF"). The FANF can also vary depending on the size and number of transactions the merchant processes. The acquiring bank also an Interchange Fee, a per-transaction fee to the issuing bank for its services. For issuing banks with $10 billion or more in assets, the Federal Reserve caps the Interchange Fee. For smaller issuing banks, the debit network sets the Interchange Fee. PIN network fees are generally lower than the fees imposed by Visa.

52.     The merchant is generally responsible for at least some of these fees and also pays an additional fee to the acquiring bank for its services. These fees, assessed on hundreds, thousands, or millions of transactions made by a merchant, add up to a significant cost for merchants. To offset these costs, merchants increase their prices for goods and services. Accordingly, consumers pay increased prices for goods and services to cover the cost of fees imposed on merchants. Thus, consumers are ultimately the party burdened with the costs of processing the debit transaction.

**Visa Becomes the Most Prominent Card Issuer**

53.     The late 1960s marked the beginning of modern ATM and point of sale ("POS") systems, which allowed consumers to enter a 4-digit PIN to withdraw money from their checking account. Visa, then referred to as BankAmericard, was a joint venture between Bank of America and

BankAmericard licensee banks and controlled by Bank of America. In the 1970s, the name was changed to Visa and the first Visa debit cards were introduced. Around this time, POS systems began to see more widespread integration into merchants, which provided a faster way to transfer money than writing checks.

54.    Visa quickly grew its debit business using its credit card relationships, infrastructure, and standing in the industry. Visa's network rules required merchants to accept Visa's credit and debit cards. Until the early 2000s, Visa had exclusive relationships with its issuing banks, which were not permitted to issue Visa's competitors' cards, like American Express or Discover.

55.    In the 1990s, Visa began offering a debit card that let consumers access their checking account on the same network that processed Visa's credit cards. This network required a signature instead of a PIN. At this point, merchants were not charged fees for accepting debit payments; fees became mainstream, however, with the introduction of Visa's debit card being processed over its credit networks. While Visa's competitors promoted PIN networks, which included minimal fees, Visa pushed its signature network that charged merchants about $1.35 on a $100 purchase. Despite charging higher fees, Visa used this network to gain market dominance. While higher fees meant higher prices for the ultimate consumer, higher fees also meant higher profits for Visa, which turned over a portion of the profits to banks in exchange for issuing its debit cards.

56.    Despite now allowing merchants to accept Visa debit cards without accepting their credit cards, and vice versa, Visa was already a dominant force in the market. Until the early 2000s, both Visa and Mastercard held exclusive relationships with their respective issuers, preventing issuers from issuing American Express or Discover-branded credit and debit cards, impeding them from growing their networks.

57.    However, in 2003, the Second Circuit found these restrictions to be illegal under antitrust laws and, after settling private litigation shortly thereafter, Visa began to allow merchants to accept debit cards without accepting credit cards, and vice versa. But at this point it no longer mattered, as Visa's market presence was already established.

58.     By 2008, Visa had become an independent public corporation, yet banks continued to own significant stock in the Company. As such, despite having the opportunity to choose between Visa-branded cards or other networks' cards, many chose to issue only Visa-branded cards, with Visa's only real competition for front-of-card placement being Mastercard.

59.     In 2012, Congress passed the Durbin Amendment, which required debit cards to support at least two unaffiliated networks. This means that debit cards must have at least one independent back-of-card debit network as a competitor to the front-of-card network. Additionally, the Durbin Amendment set limits on the interchange fees that merchants pay to regulated issuers (banks with over $10 billion in assets). However, this also limited a network's ability to provide incentive to issuers by paying them more than the cap, which hindered other networks' abilities to compete with Visa, as they would not be able to compensate issuers the costs the issuer would incur to switch networks.

60.     As a result, Visa is the front-of-card brand for over 70% of the debit card payments made in the United States, while Mastercard is a very distant second, with only 25% of debit card payment volume.

61.     Despite the innovation and investment in technology of smaller networks, many of Visa's contracts with issuers impose requirements on merchants to route the vast majority of their debit transactions through Visa's network, as opposed to the back-of-card networks. As such, even when a smaller network is able to pick up market traction, Visa's contracts with merchants lock up their volume, ultimately depriving its smaller rivals of scale and limiting routing choices.

62.     Visa has further been able to cement its market status in certain transactions that can only be routed through Visa, and are otherwise not available to back-of-card competitors. These non-contestable transactions exist as the back-of-card networks lack the ability to take part in these transactions, such as those over a certain dollar amount or fail to meet certain encryption criteria.

63.     As such, many merchants feel they are forced to accept Visa lest they lose out on significant amounts of customers and sales. And because so many consumers use Visa-branded

cards, almost all merchants need accept Visa, meaning they must route at least non-contestable transactions through Visa's network as opposed to the cheaper, smaller, back-of-card networks.

64.     Visa has one threat to its continued market dominance, fintech debit networks. These networks facilitate consumer-to-merchant payments similar to how debit card networks do, but through Automated Clearing House or Real Time Payment networks, a cheaper alternative to the Company's current offerings. Though the functionality is similar (including a credential to be used at merchants, payment guarantees, the ability to dispute charges, chargeback capabilities, and fraud protection), these networks are based on Interbank Payment Networks that use bank account credentials, not debit card credentials. That is, they do not use the network Visa has monopolized. They represent a true competitive alternative.

**Visa Uses its Position to Stifle Competition**

65.     Following the Great Recession, Visa identified two threats to its monopoly power – and each time it took specific actions to counter those threats to retain its dominance in the debit network market. The Durbin Amendment was the first threat. The Durbin Amendment was passed as part of the 2010 Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203 124 Stat. 1376 (2010), with the goal of promoting competition in the debit network industry and providing additional network choices to merchants and acquirers. As discussed, the Durbin Amendment requires issuing banks to include at least two unaffiliated debit networks on every debit card—one on the front of the card and at least one on the back of the card (*i.e.*, "front-of-card" and "back-of-card" networks).

66.     Unaffiliated networks on debit cards threaten Visa's dominance and monopoly power in the market. If more debit networks were available, Visa's competitors could gain the scale needed to compete, thereby causing Visa to lose volume and fees. Indeed, this was the initial impact of the Durbin Amendment; after it became effective in 2012, Visa initially lost volume to other debit networks that offered lower fees. If this trend had continued, Visa could have lost its market dominance. To counteract these effects of the Durbin Amendment that had promoted competition in

the debit network market, Visa used its power in the market to limit competition and retain its dominance.

67.     For nearly half of all debit transactions, Visa is the only network available to connect the consumer's issuing bank to the merchant and acquiring bank. For these transactions, known as "non-contestable transactions," Visa faces no meaningful competition and is able to threaten merchants and acquiring banks with high rates they must accept if they wish to complete the transaction. Visa's central goal, and the aim of its anticompetitive conduct, is to keep as many transactions as possible non-contestable.

68.     The rest of the transactions are known as "contestable transactions," which is when there is more than one network available to complete the transaction between the parties. In a free and fair competitive market, contestable transactions would result in lower fees and innovation to win business. Visa, however, uses its market power over non-contestable transactions to prevent competition in contestable transactions, and ultimately to render them non-contestable as well.

69.     Visa's monopoly power in non-contestable transactions gives it leverage over merchants and acquirers, who depend on non-contestable transactions to complete sales, to enter into routing agreements. Absent a routing agreement, the merchant or acquirer pays list price (also known as a "rack rate") on each transaction completed on Visa's debit network. With a routing agreement, though, the merchant or acquirer receives a discount on its transactions in exchange for committing a meaningful share of all transactions, contestable and non-contestable, to Visa's debit network. Simply put, Visa offers relatively favorable terms for merchants who cooperate and threatens punitive rack rates if merchants or acquirers route too many of their contestable transactions to Visa's competition. The offered discounts serve as predation to deny rivals sufficient scale to be viable and a sharing of rents with would-be competitors.

70.     As a result, merchants and acquirers must choose between signing routing deals or suffering punitive rack rates, thereby stunting Visa's competition from growing in scale and meaningfully competing.

71.     Visa's routing agreements ensure it is protected from facing meaningful competition. Thus, in responding to the Durbin Amendment, Visa realized that its non-contestable transactions would be unaffected. With roughly 45% of its card-present transactions being non-contestable. Additionally, as mentioned above, Visa is the front-of-card brand for over 70% of debit card payment volume in the United States, with the second-place company, Mastercard, accounting for 25% of debit card payment volume. The Company's former Head of Product North America has touted that Visa has "dominance on the front of the card." As such, Visa realized that Visa had a high number of captive transactions that would allow it to enforce significant volume commitments.

72.     Through this dominance, Visa has set up hurdles for its competitors to prevent them from gaining the traction necessary to challenge Visa, as well as co-opting any would-be competitors from actually competing with the Company. The DOJ Complaint states that Visa accomplishes this by making it harder for small competitors to develop scale on both the merchant and accountholder sides of the market.

73.     On the merchant-side, Visa forces them to enter into de facto exclusive deals that have the effect of requiring exclusive routing. Many of Visa's merchants would face staggering penalties unless they route a significant portion of their transactions through Visa's networks. Additionally, Visa takes advantage of its monopoly profits to purchase loyalty and exclusivity from its larger merchants. For example, the DOJ Complaint identifies that dozens of merchants, worth hundreds of billions of dollars in 2023, had signed contracts to route 100% of their eligible debit volume transactions through Visa's network. The DOJ Complaint also identifies that Visa had paid one large merchant over $20 million for the merchant to sign this agreement that same year.

74.     On the issuer side, Visa pays them to keep them from taking actions that would allow for merchants to route through the Company's rival networks, as this would decrease the Company's leverage. The DOJ Complaint argues that, in essence, Visa uses its monopoly power to entice issuers to enter into agreements that limit the amount of rival networks on Visa-branded debit cards, and therefore limit the choices available to merchants. For example, in its issuing contract with

JPMorgan Chase, Visa explicitly made the requirement that 90% of Visa-branded debit cards issued by the bank can have only one unaffiliated PIN network.

75.    By doing this, the Company has made it almost impossible for smaller networks such as PIN networks to win any additional market share. As such, even though PIN networks are receiving more placement on the back of cards as the result of the Durbin Amendment, these networks are still unable to gain any market share.

76.    Furthermore, as technology advances, debit cards are no longer the sole method of paying with money directly from a consumer's bank account. Indeed, the second threat to Visa's monopoly power was emerging technologies and innovations that do not rely on the debit card networks that Visa has monopolized.

77.    Many fintech companies are instituting their own alternative debit networks, which rely on a consumer's bank account number, as opposed to a debit card credential, to make real-time purchases from the customer's account. As such, in addition to frustrating the purpose of the Durbin Amendment, Visa took steps to ensure newer technologies cannot meaningfully compete for market power

78.    Many of these competitors come in the form of digital wallets, such as Apple Pay, Google Pay, and PayPal, which allow the transfer of money out of a customer's bank account by another method entirely, using Interbank Payment Networks instead of debit card networks.[2] Interbank Payment Networks use credentials of the account itself (such as the account number) rather than the credentials of a debit card linked to the account.  The image below demonstrates how these Fintech networks operate and can replace Visa.

---

[2] Fintech networks can effectively provide every service Visa's networks provide, including authorizing payments, clearing and settling transactions, providing payment guarantees, protecting against fraud, and offering chargeback services. Accordingly, Fintech networks are viable alternatives to Visa's business, and recent innovations only exacerbate this threat.



79.    The introduction of such networks, especially by such large and powerful companies, would be a disaster for Visa, as the debit card networks that it has monopolized would now face a major competitor.

80.    Recognizing the threat Fintech networks have on its business, Visa has taken affirmative steps to squash their potential in the United States and thereby retain its market dominance and power.

81.    Fintech networks' failure to gain a footing in the United States market is not the result of competition, and instead Visa's leveraging of market power. Anytime new or innovative technologies emerge, Visa buys the competition rather than competing.

82.    The DOJ alleges that, according to the Company's former CFO, when it comes to preserving its market share from technological competitors, "[E]verybody is a friend and partner. Nobody is a competitor." As such, the strategy in preserving the market share revolves around how to make these companies partner with Visa, as opposed to compete with Visa.

83.    As such, Visa utilizes its market share to offer lucrative incentives, sometimes worth hundreds of millions of dollars annually, to potential competitors on the express agreement they will not develop a competing product or otherwise act in ways that could threaten Visa's dominance. These agreements also withdraw the incentives and specify additional fees should the companies decide to compete after all. These provisions are two sides of the same coin: favorable, mutually beneficial dealings as long as the companies refrain from competing, with those benefits held in place by the knowledge that actually competing would result in the withdrawal of those benefits and additional penalties as well. For example, since 2016, Visa has had agreements with PayPal that

limit PayPal's ability to disrupt the debit market.[3]  Similarly, Visa has entered several contracts with Square that prevent Square from meaningfully competing with Visa, including preventing Square from innovating alternative networks that would threaten Visa's dominance.

84.     Visa has an additional ace up its sleeve when trying to get potential competitors on board: many of these potential competitors are also Visa customers. As such, Visa utilizes the threat of high fees, rack rates, and other penalties to entice competitors to instead sign contracts that will not threaten Visa's position in the marketplace.

85.     All of these agreements, regardless of if the agreement is with a merchant, issuer, or potential competitor, have had an anticompetitive effect on the marketplace that ultimately finds its way back to the consumer. As a result, Visa has flourished as a monopoly without facing any true competition, in complete violation of antitrust laws in the United States.

**<u>Visa is Subjected to Litigation</u>**

86.     On September 24, 2024, the DOJ filed a lawsuit against Visa, alleging that the Company had violated the Sherman Act by illegally maintaining a monopoly over debit network markets. Specifically, the DOJ pointed to Visa's agreements with merchants and issuers, as well as the financial incentives to digital payment platforms, as evidence of Visa's use of its dominance to stifle competition.

87.     Subsequently, several antitrust class action complaints have been filed against Visa in the Southern District of New York asserting claims under state and federal antitrust statutes. *See In re: Visa Debit Card Antitrust Litigation*, C.A. No. 24-cv-7435 (JGK) (S.D.N.Y.).

88.     Thereafter, and as a result of the foregoing lawsuits and resulting decline in Visa's share price, a securities fraud class action was filed against Visa in this Court, asserting causes of

---

[3] For example, Visa was successful in locking PayPal in to a new 10-year contract in 2022 that requires PayPal to route 100% of its Visa-eligible volume to Visa from years four to ten, and includes penalties for failing to convert its co-branded debit cards to Visa, requirements to participate in Visa's programs and services, and preservation of most of Visa's "customer choice" provisions, which give Visa preference over other competitors.

action under the Securities Exchange Act of 1934. *See Cai v. Visa Inc., et al.*, Case No. 3:24-cv-08220 (N.D. Cal.).

89.     As a result of the Individual Defendants' breaches of fiduciary duty, Visa has been made to engage in anticompetitive conduct which is now causing substantial harm to the Company through, among other things, the foregoing lawsuits.

## MATERIALLY FALSE AND MISLEADING STATEMENTS

90.     On November 15, 2023, the Company filed the 2023 10-K with the SEC, announcing its financial results for the fourth quarter and full-year of the 2023 Fiscal Year. The 2023 10-K was signed by Defendants McInerney, Suh, Andreski, Lundgren, Carney, Crawford, Fernández-Carbajal, Laguarta, List, Morrison, Murphy, Rendle, and Webb and attached certifications pursuant to Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants McInerney and Suh attesting to the accuracy of the 2023 10-K and that "this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

91.     The 2023 10-K contained risk disclosures regarding potential risks to the Company's finances. Among these disclosures was one that discussed the Company's compliance with business regulations, stating:

> **We are subject to complex and evolving global regulations that could harm our business and financial results.**
>
> Our compliance programs and policies are designed to support our compliance with a wide array of regulations and laws, such as regulations regarding anti-money laundering, anti-corruption, competition, money transfer services, privacy and sanctions, and we continually adjust our compliance programs as regulations evolve.

92.     Another risk disclosure within the 2023 10-K stated the Company's risk against litigation or investigations, with the 2023 10-K stating:

> **We may be adversely affected by the outcome of litigation or investigations.**

We are involved in numerous litigation matters, investigations, and proceedings asserted by civil litigants, governments, and enforcement bodies investigating or alleging, among other things, violations of competition and antitrust law, consumer protection law, privacy law and intellectual property law (these are referred to as "actions" in this section). Details of the most significant actions we face are described more fully in Note 20—Legal Matters to our consolidated financial statements included in Item 8 of this report. These actions are inherently uncertain, expensive and disruptive to our operations. In the event we are found liable or reach a settlement in any action, particularly in a large class action lawsuit, such as one involving an antitrust claim entitling the plaintiff to treble damages in the U.S., or we incur liability arising from a government investigation, we may be required to pay significant awards, settlements or fines. In addition, settlement terms, judgments, orders or pressures resulting from actions may harm our business by influencing or requiring us to modify, among other things, the default interchange reimbursement rates we set, the Visa operating rules or the way in which we enforce those rules, our fees or pricing, or the way we do business. These actions or their outcomes may also influence regulators, investigators, governments or civil litigants in the same or other jurisdictions, which may lead to additional actions against Visa. Finally, we are required by some of our commercial agreements to indemnify other entities for litigation brought against them, even if Visa is not a defendant.

93.    On December 7, 2023, the Company filed its Schedule 14(a) with the SEC for (the "2023 Proxy Statement"). Defendants McInerney, Carney, Crawford, Fernández-Carbajal, Laguarta, List, Lundgren, Morrison, Murphy, Rendle, and Webb solicited the 2023 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

94.    The 2023 Proxy Statement called for Company shareholders to vote to, inter alia: (1) re-elect Defendants McInerney, Carney, Crawford, Fernández- Carbajal, Laguarta, List, Lundgren, Morrison, Murphy, Rendle, and Webb to the Board; (2) approve executive compensation on an advisory basis; (3) ratify the selection of KPMG LLP as the Company's independent registered public accounting firm for the 2024 Fiscal Year; (4) approve an amendment to the Company's Certificate of Incorporation to allow Class B stockholders to exchange and transfer their Class B common stock; and (5) adjourn the Annual Meeting to a later date or time, if necessary, to solicit additional proxies in favor of the previous proposal.

95.    With respect to the Company's Code of Conduct, the 2023 Proxy Statement stated:

Our Board has adopted a Code of Business Conduct and Ethics, which applies to all directors, officers, employees, and contingent staff of the Company. This Code includes a supplemental Code of Ethics for Certain Executives and Financial Officers, which applies to our Chief Executive Officer, Chief Financial Officer, Controller, Chief People and Corporate Affairs Officer, General Counsel, and other senior financial officers, whom we refer to collectively as senior officers. These Codes require the senior officers to engage in honest and ethical conduct in performing their duties, provide guidelines for the ethical handling of actual or apparent conflicts of interest between personal and professional relationships, and provide mechanisms to report unethical conduct. Our senior officers are held accountable for their adherence to the Codes. If we amend or grant any waiver from a provision of our Codes for officers or directors, we will publicly disclose such amendment or waiver in accordance with and if required by applicable law, including by posting such amendment or waiver on our website at investor.visa.com within four business days.

96.     Regarding the "Board of Directors' Role in Risk Oversight," the 2023 Proxy Statement stated the following, in relevant part:

Our Board recognizes the importance of effective risk oversight in running a successful business and in fulfilling its fiduciary responsibilities to Visa and its stockholders. While the Chief Executive Officer; Chief Risk Officer; General Counsel; Chief Financial Officer; Vice Chair, Chief People and Corporate Affairs Officer; President, Technology; Chief Information Security Officer; and other members of our senior leadership team are responsible for the day-to-day management of risk, our Board is responsible for promoting an appropriate culture of risk management within the Company and for setting the right "tone at the top," overseeing our aggregate risk profile, and monitoring how the Company addresses specific risks, such as strategic and competitive risks, financial risks, brand and reputation risks, cybersecurity and technology risks, ecosystem risks, legal and compliance risks, regulatory risks, and operational risks.

97.     Defendants McInerney, Carney, Crawford, Fernández-Carbajal, Laguarta, List, Lundgren, Morrison, Murphy, Rendle, and Webb caused the 2023 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the Company was participating in the anticompetitive misconduct in violation of federal antitrust laws; (2) as such, the Company was likely to be subject to lawsuits and penalties by federal agencies; and (3) at all relevant times, the Company failed to have effective internal controls. As the Director Defendants knew, or should have known in the exercise of prudent business judgment, the foregoing, these statements are half-truths,

1  meaning that the Director Defendants were required to (yet failed to) include all additional

2  information necessary to make the statement not misleading. *See* 17 C.F.R. § 240.12b-20.

3      98.    The 2023 Proxy Statement was also false and misleading because, despite assertions

4  to the contrary, the Company's Code of Conduct and the Audit Committee Charter were not

5  followed, as evidenced by the Individual Defendants: (1) making and/or causing the Company to

6  make the numerous false and misleading statements and omissions alleged herein; and (2) failing to

7  report violations of the Code of Conduct. Further, the 2023 Proxy Statement was materially false

8  and misleading because, despite assertions to the contrary, the Board was not adequately performing

9  its risk oversight functions.

10      99.    Defendants McInerney, Carney, Crawford, Fernández-Carbajal, Laguarta, List,

11  Lundgren, Morrison, Murphy, Rendle, and Webb causing the 2023 Proxy Statement to be false and

12  misleading, Company shareholders voted, *inter alia*, to: (1) re-elect Defendants McInerney, Carney,

13  Crawford, Fernández-Carbajal, Laguarta, List, Lundgren, Morrison, Murphy, Rendle, and Webb to

14  the Board, allowing them to continue breaching their fiduciary duties to the Company; (2) approve

15  executive compensation on an advisory basis; (3) ratify the selection of KPMG LLP as the

16  Company's independent registered public accounting firm for the 2024 Fiscal Year; and (4) approve

17  an amendment to the Company's Certificate of Incorporation to allow Class B stockholders to

18  exchange and transfer their Class B common stock.

19      100.    On January 26, 2024, the Company filed its quarterly report on Form 10- Q with the

20  SEC for the first quarter of the 2024 Fiscal Year (the "Q1 2024 10-Q"). The Q1 2024 10-Q was

21  signed by Defendants McInerney, Suh, and Andreski and attached SOX certifications signed by

22  Defendants McInerney and Suh attesting to the accuracy of the Q1 2024 10-Q and that "this report

23  does not contain any untrue statement of a material fact or omit to state a material fact necessary to

24  make the statements made, in light of the circumstances under which such statements were made,

25  not misleading with respect to the period covered by this report."

26      101.    The Q1 2024 10-Q had the same false and misleading disclosures pertaining to the

27  Company's legal compliance and litigation risk as the 2023 10-K.

28

102.     On April 24, 2024, the Company filed its quarterly report on Form 10-Q with the SEC for the second quarter of the 2024 Fiscal Year (the "Q2 2024 10-Q"). The Q2 2024 10-Q was signed by Defendants McInerney, Suh, and Andreski and attached SOX certifications signed by Defendants McInerney and Suh attesting to the accuracy of the Q2 2024 10-Q and that "this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

103.     The Q2 2024 10-Q had the same false and misleading disclosures pertaining to the Company's legal compliance and litigation risk as the 2023 10-K and the Q1 2024 10-Q.

104.     On July 24, 2024, the Company filed its quarterly report on Form 10-Q with the SEC for the third quarter of the 2024 Fiscal Year (the "Q3 2024 10-Q"). The Q3 2024 10-Q was signed by Defendants McInerney, Suh, and Andreski and attached SOX certifications signed by Defendants McInerney and Suh attesting to the accuracy of the Q3 2024 10-Q and that "this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

105.     The Q3 2024 10-Q had the same false and misleading disclosures pertaining to the Company's legal compliance and litigation risk as the 2023 10-K and the Q1 and Q2 2024 10-Qs.

106.     The above-referenced statements were materially false and misleading and failed to disclose, *inter alia*, that: (i) the Company was participating in anticompetitive misconduct in violation of federal antitrust laws; (ii) as such, the Company was likely to be subject to lawsuits and penalties by federal agencies; and (iii) at all relevant times, the Company failed to have effective internal controls. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**THE TRUTH EMERGES**

107.    On September 23, 2024, after the market closed, multiple, reputable news outlets (including *Bloomberg* and *Politico*) began to report that the DOJ was preparing to imminently file a lawsuit against the Company for purported antitrust violations.

108.    Before the market opened the following day, on September 24, 2024, the DOJ filed the DOJ Complaint in the Southern District of New York, alleging four separate violations of the Sherman Act.

109.    The DOJ Complaint alleges that the Company's market dominance for debit payment processing is the result of a number of anticompetitive actions that were designed to prevent smaller competitors from gaining any market share and competing with Visa on the merits. The DOJ Complaint goes on to allege that the Company utilizes dual-sided network effects that exist as the result of its currently market share, to freeze out smaller competition and continue its dominance. The Company then abuses that power by bullying merchants to solely use its platform, ultimately causing harm to the consumer.

110.    The DOJ Complaint identifies a number of impermissible practices through which the Company violated antitrust laws, including tying debit offering to discounts on the fees charged for credit offering, offering merchants below-cost incentives such that it is financially infeasible for the merchants to use any other platform, and locking up both banks and merchants with exclusivity deals that would penalize them should they use a different service provider.

111.    Further, because Visa has such a high market share, merchants have little to no choice but to accept the Company's demand, otherwise the Company would impose serious fees on debit card transactions the merchants need in order to continue their business. The DOJ Complaint alleges that these actions ultimately harm the consumers, who lose out on a free, fair, and functioning competitive marketplace for debit transactions.

112.    The DOJ Complaint calls the Company's actions and policies "willful" and "unlawful," namely as it is the result of a highly coordinated, purposeful scheme, stating:

In undertaking this course of conduct, Visa has acted with specific intent to monopolize each relevant market in the United States. Each of Visa's actions individually and collectively were specifically intended to monopolize each relevant market in the United States by destroying effective competition in those markets through the acts alleged herein. There is a dangerous probability that, unless restrained, Visa will succeed in monopolizing each market in the United States in violation of Section 2 of the Sherman Act.

113.    The DOJ Complaint continues to explain how the Company continues to grow its monopoly, stating:

Visa's dominance today is the result of a meticulous strategy to lock up debit volume to prevent competition at the point-of-sale. It is not an accidental historical artifact of its large size or the result of competition on the merits, but instead the result of deliberate efforts. Visa's efforts effectively forestall competition from smaller debit networks (*e.g.*, PIN networks) and thwart government regulation implemented over a decade ago, which Visa has seen as threats to its dominance.

114.    The DOJ Complaint further alleges that the Company will enter into collusive agreements with rising fintech companies that would ensure that they will not pose a threat to the Company's business. The Company has even admitted that it would rather collude and coerce competitors as opposed to compete with them, with the DOJ Complaint even quoting the Company's former CFO as saying that "Everybody is a friend and partner. Nobody is a competitor."

115.    On this news, the price of the Company's stock fell $15.85 per share, or approximately 5.5%, from a close of $288.63 per share on September 23, 2024, to close at $272.78 per share on September 24, 2024.

## **INSIDER TRADING ALLEGATIONS**

116.    Through the Relevant Period, while in possession of material non-public information, three of the Individual Defendants breached their fiduciary duties by engaging in lucrative insider trading while the Company's stock was artificially inflated as a result of the Individual Defendants' false and misleading statements discussed herein, reaping personal profits of approximately $12.6 million.

117.    Defendant McInerney sold 41,740 shares of Company stock on inside information, for which he received approximately $11.6 million in total proceeds. His insider sales, made with

knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

118.    Defendant Andreski sold 2,615 shares of Company stock on inside information, for which he received approximately $729,281 in total proceeds. His insider sale, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

119.    Defendant Carney sold 909 shares of Company stock on inside information, for which he received approximately $250,472 in total proceeds. His insider sale, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

## SHARE REPURCHASES

120.    During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of approximately $8,397,780,000 to repurchase approximately 30,000,000 shares of its own common stock at artificially inflated prices between February 2024 and September 2024, as follows:

| Date | Units Repurchased | Average Repurchase Price ($) | Total Cost of Repurchases ($) | Total Overpayment ($)[4] |
|------|-------------------|------------------------------|-------------------------------|--------------------------|
| February 2024 | 3,000,000 | 281.09 | 843,270,000 | 24,930,000 |
| March 2024 | 5,000,000 | 286.26 | 1,431,300,000 | 67,400,000 |
| May 2024 | 8,000,000 | 278.69 | 2,229,520,000 | 47,280,000 |
| June 2024 | 9,000,000 | 275.11 | 2,475,990,000 | 20,970,000 |
| September 2024 | 5,000,000 | 283.54 | 1,417,700,000 | 53,800,000 |
| TOTAL | 30,000,000 | -- | 8,127,780,000 | 214,380,000 |

121.    As such, throughout the Relevant Period, while issuing false and misleading statements to the market, the Individual Defendants caused the Company to repurchase over 7.7

---

[4] "Total Overpayment" refers to how much the Company overpaid for its own stock and is calculated by subtracting what the Company should have paid for its stock at its true value ($272.78) from the total amount the Company actually paid for its stock.

million shares of its own common stock at artificially inflated prices, causing it to overpay for its own stock by over *$787.7 million*.

122.    These harmful actions could not be the product of informed business judgment, nor could they be construed as being in the best interests of the Company. As a result, the Company has suffered substantial harm which was caused by, or otherwise permitted by, each of the Individual Defendants, in direct violation of their fiduciary duties owed to the Company.

## DAMAGE TO THE COMPANY

### Securities Class Action

123.    On November 20, 2024, a securities class action complaint was filed in the United States District Court for the Northern District of California against the Company and Defendants McInerney, Suh, and Andreski. The complaint alleges violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and SEC Rule 10b-5, in the case captioned: *Cai v. Visa Inc., et al.*, Case No. 3:24-cv-08220 (N.D. Cal.) ("Securities Class Action").

124.    As a result of the wrongs complained of herein, the Individual Defendants have subjected the Company to the significant cost of defending itself and certain of the Company's former officers. The Company will continue to incur significant sums in relation to the above Securities Class Action and any liability or settlement that results.

### DOJ Action

125.    As described herein, on September 24, 2024, the DOJ filed a complaint in the United States District Court for the Southern District of New York against the Company alleging violations of the Sherman Act.

126.    As a result of the wrongs complained of herein, the Individual Defendants have subjected the Company to the significant cost of defending itself in this DOJ Action. The Company will continue to incur significant sums in relation to the DOJ Action and any liability or settlement that results.

///

**Antitrust Class Action**

127.  Following the DOJ action, several antitrust class action complaints were filed against the Company, asserting violations of state and federal antitrust laws. The various class actions were consolidated in the Southern District of New York and a consolidated amended class action complaint was filed on December 27, 2024, in the case captioned: *In Re: Visa Debit Card Antitrust Litigation*, C.A. No. 24-cv-7435 (JGK) (S.D.N.Y.).

128.  As a result of the wrongs complained of herein, the Individual Defendants have subjected the Company to the significant cost of defending itself in this Antitrust Class Action. The Company will continue to incur significant sums in relation to the Antitrust Class Action and any liability or settlement that results.

**Unjust Compensation**

129.  At all relevant times, the Company paid lucrative compensation to certain of the Individual Defendants. The Company paid the Individual Defendants in connection with their respective roles as officers and/or directors of the Company.

130.  Accordingly, as part of their respective roles, the Individual Defendants were required to, among other things, exercise due care and diligence in the management and administration of the affairs of the Company, act ethically and in compliance with all laws and regulations, maintain adequate internal controls, and conduct business in a fair and transparent manner. Further, each of the Individual Defendants had additional duties and responsibilities owed to the Company by virtue of their executive, directorial and/or committee roles, as described *supra*, for which they were compensated for.

131.  However, the Individual Defendants failed to carry out their duties adequately or at all, causing harm to the Company, as alleged herein. Because the Individual Defendants failed to carry out their respective duties, the compensation they received during the Relevant Period was excessive and undeserved. As such, the Individual Defendants were unjustly enriched to the detriment of the Company.

**Insider Trading**

132.    As also detailed above, Defendants McInerney, Andreski, and Carney while in possession of material, non-public information (described *supra*), collectively sold copious of their personally held stock for collective gross proceeds in excess of over $12 million.

**Share Repurchases**

133.    As detailed above, during the Relevant Period, the Individual Defendants caused the Company to repurchase its own common stock at artificially inflated prices, causing the Company to overpay for its own common stock by over $214.3 million.

**Additional Damages to the Company**

134.    In addition to the damages specified above, the Company will also suffer further losses in relation to any internal investigations and amounts paid to lawyers, accountants, and investigators in connection thereto.

135.    The Company will also suffer losses in relation to the Individual Defendants' failure to maintain adequate internal controls, including the expense involved with implementing and maintaining improved internal controls.

136.    As a direct and proximate result of the Individual Defendants' conduct, Visa has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## CORPORATE GOVERNANCE

137.    At all relevant times, the Company had in place extensive corporate governance documents imposing duties and responsibilities on its directors and officers, and additional duties on the Company's committee members.   Accordingly, each of the Individual Defendants were required to comply with the corporate governance documents, as detailed below.

138.    Despite the following corporate governance, the conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless

disregard for their duties to the Company and its investors that the Individual Defendants were aware posed a risk of serious injury to the Company.

**Code of Business Conduct**

139.    At all relevant times, the Company had in place its Code of Business Conduct and Ethics ("Code of Conduct") which "applies to everyone working with or on behalf of Visa, including employees, contingent staff and the Board of Directors." The Code of Conduct "outlines [the Company's] commitment to the highest levels of business ethics and integrity."

140.    In the section "Do Your Part – Speak Up," the Code of Conduct states, in relevant part:

> If you are asked to do something that makes you feel uncomfortable, or you see or suspect activity that goes against our Code, the law or our values, let someone know. Choose the reporting channel that feels right for you.

141.    In the section "We Avoid Conflicts of Interest," the Code of Conduct states, in relevant part:

> How We Lead
>
> We are transparent in our business dealings. By avoiding conflicts of interest and disclosing potential areas of conflict, we demonstrate our commitment to and support of Visa's strong ethical culture. We never put our personal interests in conflict with those of Visa. We all play a role in protecting our company. The power of our brand depends on our reputation.
>
> How It Helps
>
> As Visa employees, we share a common interest in protecting our company. We are transparent in our business dealings and avoid situations that put our personal interests in conflict with those of Visa or lead others to question our business or professional objectivity. If you become aware of a potential conflict, you have an obligation to disclose it.
>
> How We Act
>
> We follow our Conflict of Interest Policy and disclose potential conflicts to enable the company to assess any risk and put in place mitigation if necessary. If you have any additional questions or concerns regarding your conflict of interest disclosure obligations, either under the Conflict of Interest Policy or External Board, Advisory or Equivalent Roles Policy, please contact the Business Conduct Office.

142.    In the section "We Protect Our Assets" the Code of Conduct states, in relevant part:

How We Lead

Our assets are the tools and information we use to do our work each day. They allow us to operate effectively as a company and help us continue to be successful.

How It Helps

Through hard work, we have built up key business assets over the course of our history. Without these assets, we cannot serve our customers and business partners. These assets are also essential to our strategic vision for the future. We are all responsible for our assets, which come in many forms:

• Physical assets: furniture, funds, supplies and facilities
• Electronic assets: our technology resources, including hardware, software, mobile devices and tablets

How We Act

We protect our assets when we:

• Ensure that assets are not damaged, lost or stolen
• Report immediately when assets are defective or in need of repair
• Use all assets appropriately and with good judgment
• Follow all procedures to keep assets secure, both in the office and while traveling
• Never allow unauthorized individuals to use our assets

143.    In the section "Accuracy in Recordkeeping" the Code of Conduct states, in relevant part:

How We Lead

We maintain accurate records that appropriately support business transactions in our financial statements. By following our internal controls, finance policies and procedures and recordkeeping policies, we achieve this goal. Even internal business records and communications may become public. This is why we must always avoid exaggerated information, inappropriate language and guesswork in our recordkeeping.

How It Helps

Accurate financial records are essential to making sound business decisions and complying with the law. We must maintain the trust that investors, customers and

business partners place in us. Even internal records may become public, so we never exaggerate or guess when it comes to recordkeeping.

How We Act

To ensure accurate recordkeeping, we:

• Always keep detailed books, records and accounting statements
• Comply with generally accepted accounting principles, laws and regulations
• Follow all internal controls and policies
• Accurately record all our transactions, without exaggeration
• Submit all records to internal and external auditors promptly
• Report any records that appear false or misleading

144.    Under the same heading, there is a subsection titled "Code of Ethics for Certain Executive and Financial Officers," in which the Code of Conduct states:

The Code of Ethics for Certain Executive and Financial Officers outlines additional requirements. These apply to the Chief Executive Officer (CEO), Corporate Secretary, General Counsel and certain financial officers (including the Chief Financial Officer, Chief Accounting Officer and Corporate Controller).

These officers shall promptly notify the General Counsel of any of the issues listed below. The General Counsel will then review, as appropriate, with the CEO, Disclosure Committee, Audit and Risk Committee or Board of Directors the following:

• Any material information that could affect our public filing disclosures
• Any significant deficiencies or material weaknesses in the design or operation of internal controls that could adversely affect our ability to record, process, summarize and report financial data
• Any fraud that involves management or other staff who have a significant role in our financial reporting, disclosures or internal controls
• Any material violation of our Code of Business Conduct and Ethics or other securities laws by the company, management or staff
• Any actual or apparent conflict of interest of any material transaction or relationship with the company
• Any information related to the independence of our external auditors

145.    In the section, "Records and Information Management," the Code of Conduct states, in relevant part:

How We Lead

We handle our records and information with care. The integrity of our recordkeeping is core to our business.

How It Helps

We optimize performance and reduce risk when we maintain records according to the law and our policies. We generate records in the course of our business, and some must be retained for specific periods of time.

How We Act

To manage records effectively, we:

• Keep and dispose of information according to our policies and internal controls
• Record financial transactions accurately
• Ensure records are easy to access, organized and secure
• Report any suspected fraud or misrepresentation in our records
• Keep any records subject to a hold from the Legal Department
• Provide any records requested in connection with an audit or investigation
• Ensure that our accounting matters include travel and expenses, accounting, internal accounting controls and SOX auditing matters

146.    In the section "We Uphold the Law," the Code of Conduct states "There is a difference between the spirit of the law and the letter of the law. At Visa, we strive to uphold both. We are committed to complying with applicable laws in every decision we make, and in every action we take. This is how we lead by example."

147.    In the section "We Do Not Engage in Insider Trading," the Code of Conduct states:

How We Lead

We never share non-public information for the purpose of buying or selling securities, nor do we use such information to tip others or hedge, pledge, or short sell our own stock. Insider trading is not just unethical; it is illegal.

How It Helps

In the course of our jobs, we may have access to material, nonpublic information about Visa. We may learn such information about our clients, vendors or partners. We never share this. Our reputation as a trustworthy company relies on it

How We Act

We prevent insider trading when we:

• Never buy or sell Visa shares, or shares in any publicly traded company, when we have inside information
• Never share inside information outside the company
• Only share inside information within the company on a "need-to-know" basis
• Never "tip," or pass along inside information to someone who may act on it
• Never hedge, pledge or short-sell

148.    In a section titled "Waivers of the Code of Business Conduct and Ethics," the Code of Conduct states:

> The Corporate Risk Committee must approve staff member requests for waivers of this Code. The Europe Risk Committee must also approve Visa Europe Limited staff member requests for waivers of this Code. Waivers for officers or directors, including waivers to the Code of Ethics for Certain Executive and Financial Officers (which contains additional requirements regarding the maintenance of the company's financial records and preparation of financial statements), may be made only by the Board of Directors or an authorized committee of the Board. These will be disclosed promptly as required by law, regulation or stock exchange listing requirements.

**Audit Committee Charter**

149.    At all relevant times, the Company had in place its Audit Committee Charter which governs the Audit Committee's roles and responsibilities. The Audit Committee Charter states the following regarding the purpose of the Audit Committee:

> The Audit and Risk Committee (Committee) of the Board of Directors (Board) of Visa Inc.(Company) assists the Board in its oversight of the independent auditor's qualifications, independence and performance; the integrity of the Company's financial statements; the Company's internal audit function; the Company's compliance with legal and regulatory requirements; the Company's risks; and other Committee functions set forth in this Charter.

150.    Under the heading "Responsibilities and Duties," in a subsection titled "Independent Auditor," the Audit Committee Charter states the following, in relevant part:

> 1. Appoint, retain, compensate and replace the Company's independent auditor. The Committee will recommend that the Board ask the stockholders to ratify the Committee's selection. The independent auditor will report directly to the Committee.
>
> 2. Meet with the independent auditors to discuss and approve the integrated audit plan, including any significant changes to the plan during the year.
>
> 3. Review and approve the Company's pre-approval policy, and pre-approve all audit and permissible non-audit services to be provided by the independent auditor.

4. Review and evaluate the lead audit partner of the independent auditor and oversee the rotation of the audit partner as required by law.

5. Obtain and review a report from the independent auditor at least annually regarding (a) the independent auditor's internal quality-control procedures, (b) any material issues raised by the most recent internal quality-control review, or peer review, of the firm, or by any inquiry or investigation by governmental or professional authorities within the preceding five years with respect to one or more independent audits carried out by the firm, (c) any steps taken to deal with any issues, and (d) all relationships between the independent auditor and the Company.

6. Evaluate the qualifications, performance and independence of the independent auditor, including considering whether the auditor's quality controls are adequate and the provision of permitted non-audit services is compatible with maintaining the auditor's independence, taking into account the opinions of management and internal auditors and the required communications by the independent auditors.

7. Set policies for the Company's hiring of employees or former employees of the independent auditor.

151.     Under the same heading, in a subsection titled "B. Financial Statements and Internal Controls over Financial Reporting" the Audit Committee Charter states the following, in relevant part:

1. Meet to review and discuss with management and the independent auditor the annual audited financial statements and quarterly financial statements, including reviewing the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" and any other matters related to management's certification of the financial statements in the Company's annual reports on Form 10-K and quarterly reports on Form 10-Q.

2. Based on the Committee's review and discussion, recommend to the Board the audited financial statements for inclusion in the Company's Form 10- K.

3. Prepare, review and approve the audit committee report to be included in the Company's proxy statement.

4. Oversee the integrity of the Company's financial statements and discuss with management and the independent auditor significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including any significant changes in the Company's selection or application of accounting principles.

5. Review and discuss with management and the independent auditor any major issues as to the adequacy and effectiveness of the Company's internal controls over financial reporting, any special steps adopted in light of material control deficiencies, and the adequacy of the disclosures.

6. Review and discuss with management and the independent auditor the Company's internal controls report and the independent auditor's attestation of the report prior to the filing of the Form 10-K.

7. Review and discuss reports from the independent auditors on: a. all critical accounting policies and practices to be used; b. all alternative treatments of financial information within generally accepted accounting principles related to material items that have been discussed with management, ramifications of the use of alternative disclosures and treatments, and the treatment preferred by the independent auditor; c. the effect of regulatory and accounting initiatives as well as off-balance sheet structures on the Company's financial statements; and d. other material written communications between the independent auditor and management, such as any management letter or schedule of unadjusted differences.

8. Discuss with management the Company's earnings results, as well as the types of financial information and earnings guidance provided to analysts and rating agencies. Each instance in which the Company provides earnings guidance may be general (discussion of the types of presentation of information to be disclosed) and need not be discussed in advance.

9. Discuss with management the status of income tax returns and related government audits, if any, and the Company's overall tax strategy including areas requiring significant judgment or risk.

10. Discuss with management the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures, including the Company's related risk assessment and risk management policies.

11. Discuss with the independent auditor the matters required to be discussed by applicable auditing standards relating to the conduct of the audit, including any difficulties encountered in the course of the audit work and management's response, any restrictions on the scope of activities or access to requested information, and any significant disagreements with management as well as resolution of those disagreements.

12. Discuss with management and the independent auditor any correspondence with regulators or governmental agencies and any published reports that raise material issues regarding the Company's financial statements or accounting policies

152.    Under the same heading, in a subsection titled "D. Compliance and Risk Oversight Matters" the Audit Committee Charter states the following:

1. Review and recommend to the Board annually for approval the Code of Business Conduct and Ethics, including provisions governing certain executive and financial officers.

2. Monitor compliance with the Code of Business Conduct and Ethics, and applicable legal requirements. Review and approve, at the Committee's discretion, any request made by an executive or financial officer for a waiver of the Code of Business Conduct and Ethics.

3. Establish procedures for the receipt, retention and treatment of complaints received by the Company regarding possible securities law violations and accounting, internal accounting controls or auditing matters, and the confidential, anonymous submission by employees of these matters.

4. Review at least annually with the Chief Ethics and Compliance Officer the implementation and effectiveness of the Company's compliance and ethics program. The Chief Ethics and Compliance Officer, who is the individual designated as having operational responsibility for the Company's compliance and ethics program, shall have the authority to communicate directly to the Committee, promptly, about actual and alleged violations of law or the Company's Code of Business Conduct and Ethics, including any matters involving criminal or potential criminal conduct.

5. Discuss with the General Counsel legal matters that may have a material impact on the Company's financial statements, compliance policies and internal controls.

6. Review and approve the Related Persons Transactions Policy, and review and approve these transactions consistent with the policy.

7. Review the Company's risk management framework and programs by which management discusses the Company's risk profile and risk exposures with the Board, annually review and approve the Company's risk appetite statement, annually review the Company's third party risk management program, and oversee specific categories of risk (as determined by the Board from time to time) and the Company's related risk assessment and risk management policies.

8. Annually review the Company's cyber security program and approve any material changes to the information security strategy, and review the Company's privacy program.

9. Annually review and approve the Company's operational resilience program.

10. Annually review the Company's insurance programs

## DUTIES OF THE DIRECTOR DEFENDANTS

153.    As members of the Company's Board, the Director Defendants were held to the

highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

154.    The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company.

155.    By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Director Defendants owed the Company and its investors the fiduciary obligations of trust, loyalty, and good faith.  The obligations required the Director Defendants to use their utmost abilities to control and manage the Company in an honest and lawful manner.  The Director Defendants were and are required to act in furtherance of the best interests of the Company and its investors.

156.    Each director of the Company owes to the Company and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.  In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

157.    To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and investing public;

(b)    conduct the affairs of the Company in an efficient, businesslike manner so as

to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)     remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)     ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

158.     Each Director Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

159.     The Director Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the financial condition of the

Company.  As a result, the Company has expended, and will continue to expend, significant sums of money related to investigations and lawsuits and to structure settlements to resolve them.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

160.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, gross mismanagement, and other wrongful conduct as alleged herein.

161.    Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

162.    Plaintiff is a current owner of the Company's common stock and has continuously been an owner of the Company's stock during all times relevant to the Director Defendants' wrongful course of conduct alleged herein. Plaintiff understands her obligation to hold stock throughout the duration of this action and is prepared to do so.

163.    Because of the facts set forth herein, Plaintiff has not made a demand on the Board to institute this action against the Individual Defendants.  Such a demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

164.    The Company Board is currently comprised of eleven (11) members – Defendants McInerney, Carney, Crawford, Fernández-Carbajal, Laguarta, List, Lundgren, Morrison, Murphy, Rendle, and Webb (*i.e.*, the Director Defendants). Thus, Plaintiff is required to show that a majority of the Director Defendants, *i.e.*, six (6), cannot exercise independent objective judgement about whether to bring this action or whether to vigorously prosecute this action.

165.    Each of the Director Defendants face a likelihood of liability in this action because they caused and/or permitted the Company to make false and misleading statements and omissions concerning the information described herein. Because of their advisory, managerial, and directorial positions within the Company, the Director Defendants had knowledge of material, non-public

information regarding the Company and were directly involved in the operations of the Company at the highest levels.

166.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

167.    The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

168.    Each of the Director Defendants, by virtue of their roles, were required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, the Director Defendants failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

169.    As trusted Company directors, the Director Defendants conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded their duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded their duties to protect corporate assets.

170.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

171.    Each of the Director Defendants reviewed, authorized, signed, and thus personally

made and/or otherwise permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

172.    Each of the Director Defendants solicited the proxy statement containing the false and misleading statements, as discussed *supra*, which obtained their re-election to the Board, thus enabling them to continue breaching their fiduciary duties to the Company. As each Director Defendant benefitted, either directly or indirectly, from the false and misleading proxy statement, they are incapable of considering a demand to sue.

173.    Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

174.    Further, the Director Defendants authorized the harmful share repurchase program and caused the Company to repurchase its own common stock at artificially inflated prices, thereby causing the Company to overpay for its own stock. As such, the Director Defendants face a substantial likelihood of liability therefor and are incapable of independently considering a demand in the best interests of the Company.

175.    Despite having knowledge of the history of their own misconduct and mismanagement, the Director Defendants have failed to seek recovery for Visa for any of the misconduct alleged herein.

**THE DIRECTOR DEFENDANTS ARE**

**<u>NOT INDEPENDENT OR DISINTERESTED</u>**

**<u>Defendant McInerney</u>**

176.    Defendant McInerney is not disinterested or independent, and therefore, is incapable of considering demand because he (as its president and CEO) is an employee of the Company who derives substantially all of his income from his employment with Visa, making him not independent,

as admitted by the Company.  As such, Defendant McInerney cannot independently consider any demand to sue himself for breaching his fiduciary duties to Visa, because that would expose him to liability and threaten his livelihood.

177.    As CEO, Defendant McInerney also fails the NYSE's bright-line independence test and cannot, therefore, be considered independent. As such, Defendant McInerney could not objectively and disinterestedly consider a demand to sue the Individual Defendants and any demand upon Defendant McInerney is therefore futile.

178.    As the Company's highest officer and influential member of the Board, Defendant McInerney was ultimately responsible for the issuance of all of the false and misleading statements during the Relevant Period, including the false and misleading statements in the Company's SEC filings, all of which he signed. In addition, Defendant McInerney personally made false and misleading statements, as alleged above, and thus faces a substantial likelihood of liability therefor.

179.    In addition, Defendant McInerney receives lucrative compensation in connection with his employment with the Company. Defendant McInerney is not independent from the members of the Compensation Committee who are responsible for evaluating and determining the compensation of the CEO and Executive Officers, including Defendant McInerney. The purpose of the Compensation Committee is to assist the Board in discharging its responsibilities related to the compensation provided by the Company to its CEO and Executive Officers.  Because of his status as an inside director, and the concomitant substantial compensation he receives, Defendant McInerney could not consider a demand adverse to the other Director Defendants serving on the Compensation Committee who are responsible for his financial future.

180.    Furthermore, as alleged herein, Defendant McInerney engaged in unlawful insider trading which garnered lucrative gross proceeds.

181.    Because of Defendant McInerney's participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, Defendant McInerney is unable to comply with his fiduciary duties and prosecute this action.  Defendant McInerney is in a position of irreconcilable conflict of interest in terms of the prosecution of this action and defending himself

in the Securities Class Action, brought under the Securities Exchange Act of 1934.

182.    Defendant McInerney is neither independent nor disinterested. Any demand upon Defendant McInerney is futile and, thus, excused.

**Defendant Carney**

183.    As alleged herein, Defendant Carney engaged in unlawful insider trading which garnered lucrative gross proceeds. As such, Defendant Carney is incapable of independently and impartially considering a demand because he not only faces a substantial likelihood of liability for his unlawful insider trading but evidently received a material personal benefit therefrom.

**Defendants Carney, Crawford, List, and Morrison**

184.    Defendants Carney, Crawford, List, and Morrison are all members of the Audit Committee and had certain additional duties by virtue thereof, as described *supra*. Among the responsibilities, Defendants Carney, Crawford, List, and Morrison were required to oversee the Company's compliance with all laws and regulations. However, Defendants Carney, Crawford, List, and Morrison failed to fulfil these duties and permitted and/or caused the Company to issue false and/or misleading statements in violation of state and federal law and SEC rules. Defendants Carney, Crawford, List, and Morrison further breached their fiduciary duties by failing to ensure that adequate internal controls were in place regarding the serious issues and deficiencies described above.

185.    Defendants Carney, Crawford, List, and Morrison also personally signed the false and misleading SEC filings, reviewed and approved the false and misleading Quarterly Reports, and further failed to correct the false and misleading statements alleged herein. For these reasons, Defendants Carney, Crawford, List, and Morrison breached their fiduciary duties, face a substantial likelihood of liability and are neither independent nor disinterested, and thus demand upon them is futile and, therefore, excused.

**Additional Reasons Demand is Futile**

186.    In violation of the Code of Conduct, the Director Defendants conducted little, if any,

oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In further violation of the Code of Conduct, the Director Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

187. Visa has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not filed any lawsuits against themselves or any others who were responsible for that wrongful conduct to attempt to recover for Visa any part of the damages Visa suffered and will continue to suffer thereby. Thus, any demand upon the Director Defendants would be futile.

188. The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

189. The acts complained of herein constitute violations of fiduciary duties owed by Visa's officers and directors, and these acts are incapable of ratification.

190. The Director Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of Visa. If there is a directors' and officers' liability insurance

policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director Defendants, known as, inter alia, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain of the officers of Visa, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

191.    If there is no directors' and officers' liability insurance, then the Director Defendants will not cause Visa to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

192.    Thus, for all of the reasons set forth above, all of the Director Defendants, and, if not all of them, at least six (6) of the Director Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

### (Against the Individual Defendants for Breach of Fiduciary Duties)

193.    Plaintiff incorporates by reference and re-allege each and every allegation contained above, as though fully set forth herein.

194.    The Individual Defendants owe the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

195.    Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

196.    Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent the Company's publicly

1  reported financials. These actions could not have been a good faith exercise of prudent business

2  judgment to protect and promote the Company's corporate interests.

3      197.    As a direct and proximate result of the Individual Defendants' failure to perform their

4  fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct

5  alleged herein, the Individual Defendants are liable to the Company.

6      198.    As a direct and proximate result of the Individual Defendants' breach of their

7  fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate

8  image and goodwill.  Such damage includes, among other things, costs associated with defending

9  securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost

10  of capital, the waste of corporate assets, and reputational harm.

11              **SECOND CAUSE OF ACTION**

12      **(Against the Individual Defendants for Gross Mismanagement)**

13      199.    Plaintiff incorporates by reference and re-allege each allegation contained above, as

14  though fully set forth herein.

15      200.    By their actions alleged herein, the Individual Defendants, either directly or through

16  aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard

17  to prudently managing the assets and business of the Company in a manner consistent with the

18  operations of a publicly held corporation.

19      201.    As a direct and proximate result of the Individual Defendants' gross mismanagement

20  and breaches of duty alleged herein, the Company has sustained significant damages in excess of

21  hundreds of millions of dollars.

22      202.    Because of the misconduct and breaches of duty alleged herein, the Individual

23  Defendants are liable to the Company.

24              **THIRD CAUSE OF ACTION**

25      **(Against the Individual Defendants for Waste of Corporate Assets)**

26      203.    Plaintiff incorporates by reference and realleges each and every allegation contained

above, as though fully set forth herein.

204. The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period. It resulted in continuous, connected, and ongoing harm to the Company.

205. As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend the Individual Defendants' unlawful actions.

206. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

## FOURTH CAUSE OF ACTION

### (Against the Individual Defendants for Unjust Enrichment)

207. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

208. By their wrongful acts, violations of law, and inaccurate and untruthful information and/or omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and the detriment of, the Company

209. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance of the Company or its stock price or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

210. Plaintiff, as a shareholder and representative of the Company seeks restitution from the Individual Defendants and seek an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FIFTH CAUSE OF ACTION**

**(Against the Individual Defendants for Aiding and Abetting)**

211.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

212.    The Director Defendants exploited, aided and abetted, and were knowing and culpable participants to the breaches of fiduciary duty by the Officer Defendants. Likewise, the Officer Defendants exploited, aided and abetted, and were knowing and culpable participants to the breaches of fiduciary duty by the Director Defendants.

213.    Specifically, the Director Defendants, in violation of the Company's corporate governance, engaged in and/or permitted the Company to engage in the scheme to issue materially false and misleading statements to the public, including in the Company's SEC filings, and by facilitating and disguising the Officer Defendants' violations of law as alleged herein, and failing to report the same.

214.    The Officer Defendants, in violation of the Company's corporate governance, engaged in and/or permitted the Officer Defendants' lack of oversight and scheme to issue materially false and misleading statements to the Company's shareholders to secure, *inter alia*, the re-election of certain Director Defendants, by facilitating and disguising the Director Defendants' violations of law as alleged herein, and failing to report the same.

215.    As a result, the Director Defendants substantially assisted the Officer Defendants, and the Officer Defendants substantially assisted the Director Defendants in breaching their fiduciary duties and in committing the other wrongful and unlawful conduct as alleged herein.

216.    As a direct and proximate result of the aiding and abetting the breaches of fiduciary duty alleged herein, the Company has sustained and will continue to sustain significant damages.

217.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

///

///

## SIXTH CAUSE OF ACTION

### (Against Defendants McInerney, Andreski, and Carney for Insider Trading)

218.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

219.    By reason of their fiduciary role as officers and directors of the Company, Defendants McInerney, Andreski, and Carney (the "Insider Trading Defendants") specifically owed the Company the highest obligation of due care, good faith, and loyalty.

220.    As directors and/or officers of the Company, the Insider Trading Defendants were given access to material information about the Company, as described above, which was not generally available to the public.

221.    When the Insider Trading Defendants sold their Company stock, as detailed *supra*, they were in possession of material, non-public information described above and sold Company stock on the basis of such information for collective gross proceeds in excess of $12 million.

222.    The information described above was proprietary, non-public information concerning the Company's business operations and financial condition.  It was a proprietary asset belonging to the Company, which the Insider Trading Defendants misappropriated to their own benefit when they sold holdings in Company stock.  The Insider Trading Defendants knew that this information was not intended to be available to the public. Had such information been generally available to the public, it would have significantly reduced the market price of Company stock.

223.    As the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Trading Defendants' fiduciary duties, the Company is entitled to disgorge any illegal profits obtained thereby.

## SEVENTH CAUSE OF ACTION

### (Against the Director Defendants for Violations of § 14(a) of the
### Exchange Act, 15 U.S.C. § 78n(a) and Rule 14a-9 (17 C.F.R. § 240.14a-9))

224.    Plaintiff incorporates by reference and realleges each and every allegation set forth

above, as though fully set forth herein.

225.   Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of her name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

226.   Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

227.   The Director Defendants violated § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), and Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder by the SEC.

228.   The Director Defendants, individually and in concert, disseminated and/or permitted the dissemination of materially false and misleading statements in the 2023 Proxy Statement filed with the SEC.

229.   The 2023 Proxy Statement was used to solicit shareholder votes in connection with the re-election of the Director Defendants to the Board, among other things.

230.   The 2023 Proxy Statement was false and misleading as it failed to disclose, *inter alia*, that: (1) the Company was participating in anticompetitive misconduct in violation of federal antitrust laws; (2) as such, the Company was likely to be subject to lawsuits and penalties by federal agencies; and (3) at all relevant times, the Company failed to have effective internal controls. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

231.   The 2023 Proxy Statement was false and misleading when it discussed the

Company's Code of Conduct and the Audit Committee Charter were not followed, as evidenced by the Individual Defendants: (1) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code of Conduct. Further, the 2023 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

232.    In the exercise of reasonable care, the Director Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statements were materially false and misleading.

233.    The materially false and misleading statements contained in the Proxy Statements misleadingly induced shareholders to vote in favor of the election of the Director Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company.

234.    The Company was damaged as a result of the Director Defendants' material misrepresentations and omissions in the Proxy Statements.

## EIGHTH CAUSE OF ACTION

### (Against the Individual Defendants for Violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 Promulgated Thereunder

235.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

236.    During the Relevant Period, the Individual Defendants disseminated and/or approved public statements that failed to disclose that the above-referenced truthful facts and as a result of the foregoing, the Individual Defendants' public statements were materially false and misleading at all relevant times.  Thus, the price of the Company's shares was artificially inflated due to the deception of the Individual Defendants.  Despite this artificial inflation in the price of the Company's shares, the Individual Defendants caused and/or allowed the Company to repurchase many millions of shares of Company stock, thereby causing significant financial harm to the Company.

237.    As alleged herein, the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were

materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Visa, their control over, and/or receipt and/or modification of Visa's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Visa, participated in the fraudulent scheme alleged herein.

238. The Individual Defendants knew and/or recklessly disregarded the false and misleading nature of the information which they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the Relevant Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Individual Defendants.

239. The Individual Defendants were each members of Visa's Board of Directors and senior management team during the aforesaid time period. Based on their roles at Visa, each of the Individual Defendants would have been involved with, or knowledgeable about, the wrongdoing alleged herein.

240. At a minimum, the Individual Defendants failed to review or check information that they had a duty to monitor or ignored obvious signs that their statements were materially false and misleading or contained material omissions. Given the nature and extent of the problems at Visa, the Individual Defendants knew and/or recklessly disregarded the extent and scope of their statements during the Relevant Period.

241. Likewise, the Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels and were privy to confidential proprietary information concerning the Company and its business, operations, financial statements, and financial condition, as alleged herein. The Individual Defendants had the ultimate authority over and were

involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements regarding the Company were being issued, and approved or ratified these statements, in violation of the federal securities laws.

242.    As such the Individual Defendants caused the Company to violate section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; and (ii)  made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

243.    As a result of the wrongful conduct as alleged herein, the Individual Defendants have violated Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 promulgated thereunder and are thus liable for any harm caused to the Company.

### **REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment as follows:

A.    Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B.    Awarding, against all the Individual Defendants and in favor of the Company, the damages sustained by the Company as a result of the Individual Defendants' breaches of their fiduciary duties, gross mismanagement, waste of corporate assets, unjust enrichment, aiding and abetting, and violations of Section 10(b) of the Exchange Act;

C.    Awarding, against all Director Defendants and in favor of the Company, the damages sustained by the Company as a result of the Director Defendants' violations of Section 14(a) of the Exchange Act;

D.    Awarding, against all Insider Trading Defendants and in favor of the Company, disgorgement of all illicitly obtained proceeds from their insider trading;

E.    Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing

governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

F.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

G.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: March 26, 2025

**CLAYEO C. ARNOLD
A PROFESSIONAL CORPORATION**

*/s/ M. Anderson Berry*
M. Anderson Berry (SBN: 262879)
Gregory Haroutunian (SBN: 330263)
865 Howe Avenue
Sacramento, CA 95825
Telephone: (916) 239.4778
Fax: 916.924.1829
Email: *aberry@justice4you.com*
Email: *gharoutunian@justice4you.com*

**GAINEY McKENNA & EGLESTON**
Thomas J. McKenna*
Gregory M. Egleston*
260 Madison Avenue, 22nd Floor
New York, NY 10016
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: *tjmckenna@gme-law.com*
Email: *gegleston@gme-law.com*

*Attorneys for Plaintiff*

*\* Pro Hac Vice forthcoming*